1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| C.N., by and through his Guardian Ad Litem, Debra Newman, | ) CASE NO. CV 07-03642 MMM (SSx) |
| Plaintiff, | ) FINDINGS OF FACT AND ) CONCLUSIONS OF LAW |
| vs. | ) |
| LOS ANGELES UNIFIED SCHOOL DISTRICT, | ) |
| Defendant. | ) |

This case involves an appeal from an administrative ruling regarding certain public educational and related services that the Los Angeles Unified School District (the "District" or "LAUSD") provided to C.N., and the adequacy of those services under the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400, et seq. ("IDEA"). The parties participated in administrative due process hearings in November and December 2006 and in January 2007.[1] The administrative hearing addressed two issues: (1) whether the District denied C.N. a free

---

[1] Complaint in Support of Appeal of Decision in California Office of Administrative Hearing Under 20 U.S.C. § 1415(i)(2) ("Complaint"), ¶ 15; Answer to Complaint in Support of Appeal of Decision in California Office of Administrative Hearing Under 20 U.S.C. § 1415(i)(2) ("Answer"), ¶ 15.

appropriate public education ("FAPE") for the 2005 extended school year ("ESY") and the 2005-2006 school year (a) by refusing to administer his gastrostomy tube feedings at school using the plunge method or (b) by failing to offer a placement in a nonpublic school that allows gastrostomy tube feedings by the plunge method or, alternatively a home school program; and (2) if the District denied C.N. a FAPE, whether C.N. was entitled to compensatory education.[2]

On March 26, 2007, Office of Administrative Hearings Administrative Law Judge ("ALJ") Erlinda G. Shrenger issued a decision, finding for the District on all issues.[3]   On June 8, 2007, C.N. filed a complaint appealing the ALJ's decision.  On November 21, 2007, the court a motion filed by C.N.'s attorney to withdraw as counsel.  The District filed its opening brief on April 14, 2008.  C.N. did not file a trial brief.  Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the court found the matter appropriate for decision without oral argument.  The trial calendared for May 13, 2008 was vacated, and the matter submitted as of April 28, 2008.  Having reviewed the administrative record, the arguments of the District's counsel, and the allegations of C.N.'s complaint, the court makes the following findings of fact and conclusions of law.

# I.  FINDINGS OF FACT

## A.      Plaintiff's Disability and G-Tube Feeding Requirement

1.      C.N. was born on September 4, 1997.[4]   He is a student who is eligible for special education and related services on the basis of multiple disabilities: orthopedic, mental retardation, and other health impairments.  Before he was enrolled in the District, he was diagnosed with cerebral palsy, mental retardation, and developmental delays.[5]   The District

---

[2]Administrative Record ("AR") at 297.

[3]AR at 296-311.

[4]*Id.* at 1955.

[5]Complaint, ¶¶ 7-8; Answer, ¶ 7; AR at 1979.

2

is a public school district, organized and existing under California law.  The IDEA and California Education Code §§ 56000 et seq. require the District to provide a FAPE to eligible students residing within its jurisdictional boundaries.  Because C.N. is a "child with a disability," as that term is defined in the IDEA, 20 U.S.C. § 1401(3), he was eligible for certain special education and related services during the 2005 ESY and 2005-2006 school year.[6]

2.   C.N.'s disabilities require that he be fed through a gastrostomy tube ("G-tube") because he is not capable of swallowing food.[7]  A gastrostomy is a surgical opening into the stomach through the surface of the abdomen.[8]  A plastic device (a gastrostomy button) is inserted into the opening; it remains in place at all times and is capped by a safety plug between feedings.[9]  Nutrition may be introduced into the G-tube by either the gravity or plunge method.  When the gravity method is used, food is placed in an elevated container and enters the patient's stomach through the G-tube through the force of gravity.[10]  The plunge method requires that the individual administering the food use a syringe plunger to push the food through the G-tube into the patient's stomach.[11]  It is standard medical practice to administer G-tube feedings using the gravity method.[12]

3.   Before he entered school, C.N.'s mother used a syringe to feed him, inserting liquids instead of solid foods into his G-tube.[13]  Because he was fed in this manner, C.N. allegedly

------

[6]Complaint, ¶ 5; Answer, ¶ 5; AR at 1979.

[7]AR at 388.

[8]*Id.* at 1819.

[9]*Id.*

[10]*Id.* at 402.

[11]*Id.*

[12]*Id.* at 507.

[13]Complaint, ¶ 8.

developed a severe reflux disorder from liquidates that accumulated in his esophagus and stomach.[14]  To address this medical condition, C.N.'s mother eliminated liquids from his diet and began using the plunge method to feed him pureed foods four times per day.[15]  C.N. responded well to this feeding protocol.   His mother asserts that physicians encouraged her to use this method exclusively.[16]

**B.    California Department of Education and District Protocols Regarding G-Tube Feedings**

4.    The California Department of Education ("CDE") and the District have developed guidelines for G-tube feedings that prescribe use of a liquid diet administered by the gravity method.[17]  The District guidelines – "Gastrostomy Tube Feeding: Bolus Method" – were written and signed by the directors of Student Medical Services and Nursing, and follow the guidelines of the CDE.[18]  They are provided to a student's doctor for approval, and are then administered at a school site by District nurses.[19]

5.    Both the District guidelines and the CDE guidelines require that G-tube feedings be effectuated using the gravity method.[20]  Neither the District nor CDE permits use of the plunge method.[21]  In the hearings conducted by ALJ Shrenger, several witnesses, including C.N.'s treating physician, testified that the plunge method is unsafe and can subject the

---

[14]*Id.*

[15]*Id.*, ¶ 9.

[16]*Id.*

[17]AR at 847-49, 2052-55, 2063-68.

[18]*Id.* at 480, 84344, 847, 2052-55.

[19]*Id.* at 480, 843-44, 847.

[20]*Id.* at 2054, 2067-68.

[21]*Id.* at 462-63, 492, 510, 2053-55.

patient to serious complications.[22]  The District did present evidence, however, that if a student could not receive G-tube feedings via the gravity method, it would work with the student's physicians to attempt to identify some alternative accommodation for the student.[23]

### C.   Plaintiff's Individualized Education Program

6.   On January 27 and March 8, 2005, the District convened an individualized education program ("IEP") team meeting to assess C.N.'s school placement and medical needs.[24] During the March 8, 2005 IEP, the team noted that "[d]ue to the severe nature of the student's disability, he requires a protected environment with specialized personnel."[25] The IEP team recommended placement for C.N. for the remainder of the 2004-2005 school year, 2005 ESY, and the 2005-2006 school year (until his next annual IEP in January 2006), at Sellery Special Education School ("Sellery") in a special day class for children with multiple disabilities.  Placement also included (1) a health care assistant in the classroom and on the bus to administer C.N.'s G-tube feedings and tracheostomy needs; (2) adaptive physical education; and (3) round trip transportation between home and school.[26]

7.   At the IEP team meeting, C.N.'s mother stated that she wanted C.N. to be fed the pureed foods she provided.[27]  The school nurse advised her that the District required a doctor's protocol for such a procedure.[28]  C.N.'s mother agreed to provide the necessary

---

[22]*Id.* at 403, 512-13, 515-17, 522, 857, 941, 1714-15, 1737, 1852.

[23]*Id.* at 861.

[24]*Id.* at 1928-54; 1955-81; Complaint, ¶ 10;

[25]AR at 1974.

[26]*Id.* at 1957, 1974, 1979.

[27]Complaint, ¶ 10.

[28]AR at 1978.

5

paperwork.[29]  She did not raise any concerns at either IEP meeting regarding the feeding method offered by the IEP team – i.e., G-tube feeding via the gravity method.[30]

**D.     C.N.'s Withdrawal From School**

8.    In May 2005, C.N.'s mother withdrew him from Sellery after the bus service provided by the district delivered C.N. to his home late.[31]  C.N. did not attend the 2005 ESY program at Sellery as offered by the March 8, 2005 IEP.[32]  C.N.'s mother requested a non-public school placement, but C.N. ultimately was not enrolled in a non-public school.[33]

9.    On September 1, 2005, the District contacted C.N.'s mother and encouraged her to enroll C.N. for the 2005-2006 school year.[34]  In an attempt to address C.N.'s mother's concerns about transportation to and from Sellery, the District clarified and supplemented the March 8, 2005 IEP, offering placement at an alternative to Sellery, Willenberg Special Education Center, and adding services in the areas of physical therapy, adapted physical education, and occupational therapy and assessments in assistive technology and augmentative and alternative communication.[35]

10.   C.N. did not enroll in school, nor did C.N.'s mother inform the District that her concern regarding the feeding method was the reason for not enrolling him.[36]  In January 2006,

---

[29]*Id.*

[30]*Id.* at 1498-99, 1502-03, 1547, 1979.  Plaintiff alleges that C.N.'s mother requested that he be fed pureed foods using the plunge method. (Complaint, ¶ 10).  Because C.N. has not filed an opening brief, however, he has provided no citations to the record evidencing that such a request was made.

[31]Complaint, ¶ 11; AR at 572-73, 798, 803.

[32]AR at 803.

[33]*Id.* at 803-09.

[34]*Id.* at 1985-88.

[35]*Id.* at 1344-45, 1985-88.

[36]*Id.* at 1991.

C.N.'s mother attempted to enroll C.N. at Willenberg, but did not receive an enrollment package from the school.[37]

11.   On January 24, 2006, C.N.'s mother met with the Student Attendance Review Board ("SARB") to address C.N.'s non-enrollment in school.[38] C.N.'s mother told the board that C.N. had not been attending school because of issues related to transportation and the fact that District would not allow him to be fed via the plunge method.[39] The District advised that it could not provide transportation for C.N. to attend Willenberg, and encouraged C.N.'s mother to reconsider placement at Sellery.[40] At the conclusion of the meeting, the SARB board ordered C.N.'s mother to enroll C.N. in school and to ensure that he attended school regularly unless legitimately ill.[41]   C.N.'s mother signed the SARB board parent/student contract, indicating that she would cooperate with SARB's ruling.[42] C.N., however, was not enrolled in school.[43]

**E.     2006 IEP Team Meeting**

12.   On February 17, 2006, the District convened C.N.'s annual IEP meeting.[44] The IEP team recommended placement for C.N. for the remainder of the 2005-2006 school year, the 2006 ESY, and the 2006-2007 school year at Sellery.[45] Placement included (1) a health care assistant to assist C.N. in the classroom and on the bus (including assistance with G-

---

[37]*Id.* at 811-13.

[38]*Id.* at 1813-14.

[39]*Id.* at 809-10.

[40]*Id.* at 814-16.

[41]*Id.* at 1814.

[42]*Id.*

[43]Complaint, ¶ 13.

[44]AR at 1995-2011.

[45]*Id.* at 2008-09.

tube feedings); (2) physical therapy; (3) occupational therapy; (4) speech and language therapy; (5) adapted physical education; and (6) round trip transportation from home and school.[46]

13.  At the IEP meeting, C.N.'s mother requested that C.N. be fed pureed foods that she would provide.[47] The school nurse gave her the District's guidelines regarding G-tube feeding.[48] C.N.'s mother agreed to provide the necessary feeding protocols from C.N.'s physician.[49] She did not request a placement at a non-public school.[50] The evidence is conflicting whether C.N.'s mother requested the plunge method of feeding at this IEP team meeting.[51] The minutes of the February 17, 2006 IEP team meeting do not state that C.N.'s mother raised the issue of plunge method, and Joanne Harang, a Sellery special education teacher who attended the meeting and took notes, did not recall any discussion of the plunge method.[52] C.N.'s mother, however, testified that Patricia Bowman, the principal of Sellery, said that the plunge method would be available, and that she learned it would not only when she received a telephone call from Bowman the following week.[53]

14.  The IEP team reconvened on April 28, 2006.[54] C.N.'s mother advised the team that C.N. had not been enrolled in school because of the District's refusal to feed him pureed foods

---

[46]*Id.* at 2007-08; Complaint, ¶ 12.

[47]Complaint, ¶ 12; AR at 1560-61.

[48]AR at 817.

[49]*Id.* at 2007.

[50]*Id.* at 1507-08.

[51]*Id.* at 1554, 2007-08.

[52]*Id.*

[53]*Id.* at 817-18.

[54]*Id.* at 2025-51.

via the plunge method, as prescribed by his physician.[55]  C.N.'s mother verbally told the team that C.N.'s "GI doctor" prescribed the use of the plunge method.[56]  Although she testified that she provided a written prescription to the IEP team, the IEP documents do not reflect this, and individuals present at the meeting, including Bowman, the Sellery principal, Roselily Carandag, the Sellery District nurse, and Harang, a Sellery special education teacher, testified that they had never been given a prescription.[57]

15.  At the due process hearing, plaintiff presented a written prescription dated January 25, 2006 from a physician who did not testify.[58]  The prescription orders that C.N. be given 20 ounces of pureed food provided by his mother.[59]  It does not specify a method of G-tube feeding; it states only "give all via bolus to GT using 60 cc syringe."[60]  C.N.'s expert witness, Dr. Shaheen Idries, testified that she interpreted the prescription to order feeding via the gravity method.[61]

16.  The IEP team recommended the same placement and services offered at the February 17, 2006 IEP team meeting.  C.N.'s mother did not consent to the IEP.[62]

**F.   Plaintiff's Expert Witness, Dr. Idries**

17.  At the administrative hearing, plaintiff presented as an expert witness Dr. Shaheen Idries, a specialist in pediatric gastroenterology.[63]  Dr. Idries saw plaintiff on two occasions – in

---

[55]*Id.* at 2050; Complaint, ¶ 13.

[56]AR at 2050.

[57]*Id.* at 619, 1260-61, 1305, 1566-67.

[58]*Id.* at 1812, 1851.

[59]*Id.*

[60]*Id.*

[61]*Id.* at 934-37.

[62]*Id.* at 2048, 2050.

[63]*Id.* at 377.

April and September 2006.[64]  Dr. Idries explained that C.N. suffers from gastroesophagal reflux, which is a disorder whereby the contents of the stomach regurgitate into the esophagus.[65]  C.N. has had the condition since he was an infant.  As a result of his reflux condition, it is difficult to feed him liquids, because the stomach distends rapidly and the fluid regurgitates into the esophagus.[66]  Complications from this condition can include bleeding, cancer, pneumonia, asthma, bronchitis, sinus infections, and ear infections.[67]

18.  Dr. Idries testified that C.N.'s mother reported she had fed C.N. pureed (heavier) foods via the plunge method since he was two years old to prevent the reflux condition.[68]  The doctor acknowledged that she had never observed these feedings.[69] Furthermore, she stated that she believed the plunge method was unsafe, and that at the first visit, she had discouraged C.N.'s mother from demanding that this method be used at the school.[70]  She recommended that C.N.'s mother blend banana with Pediasure to a consistency where it could be fed via the gravity method.[71]

19.  At the next visit, C.N.'s mother told Dr. Idries that she had tried feeding C.N. banana and Pediasure using the gravity method, but that C.N. experienced signs of gastroesophageal reflux – e.g., regurgitation, foul breath, and frequent burps.[72]  C.N.'s mother had to

---

[64]*Id.* at 403, 910.

[65]*Id.* at 389.

[66]*Id.* at 390.

[67]*Id.* at 392.

[68]*Id.* at 398.

[69]*Id.* at 915.

[70]*Id.* at 403.

[71]*Id.*

[72]*Id.* at 404

1    decompress – i.e., empty – his stomach frequently.[73]

2    20.   As a result of C.N.'s problems with liquid feedings, Dr. Idries recommended that C.N.'s

3          mother train a school employee involved in C.N.'s care to administer feedings via the

4          plunge method.[74]  The doctor acknowledged that the plunge method was not safe, but felt

5          that it could be appropriate for C.N., given that his mother had fed him this way for years

6          and that he had stayed healthy.[75]  Dr. Idries stated that only a person trained by C.N.'s

7          mother should administer feedings via the plunge method,[76] and that, if a trained individual

8          was not in school on a given day, C.N. either should not be fed, should not go to school,

9          or his mother should come and feed him.[77]  Because Dr. Idries had never witnessed C.N.

10         being fed via the plunge method, her recommendation was based solely on the fact that

11         C.N.'s mother reported its success.[78]

12   21.   Dr. Idries wrote a letter to the District outlining her recommendation, but did not discuss

13         it personally with District personnel.[79]  She testified that the plunge method, while

14         apparently the best option for C.N., was not the only medically viable option for feeding

15         him during school hours.[80]

16         **G.    Plaintiff's Request for Due Process**

17   22.   On July 17, 2006, plaintiff requested a due process hearing, contesting the District's offer

18

19   _____

20         [73]*Id.* at 405-06.

21         [74]*Id.* at 410.

22         [75]*Id.* at 410-11.

23         [76]*Id.* at 411.

24         [77]*Id.*

25         [78]*Id.* at 926-29.

26         [79]*Id.* at 928-29, 1852.

27         [80]*Id.* at 932.

28

1    of a FAPE pursuant to the IDEA.[81]

2    23.   On November 17, 2006, ALJ Shrenger outlined two issues for hearing:

3    "(1) Did the District fail to provide Student a free appropriate public education for

4    extended school year (ESY) 2005 and the 2005-2006 school year by failing to

5    provide Student a placement in a non-public school that would allow him to be fed

6    through his G-tube during school hour or, alternatively, a home school program?

7    (2) If the District denied Student a free appropriate public education, is student

8    entitled to compensatory education in the form of language and speech,

9    occupational therapy, physical therapy, adapted physical education, assisted

10   technology, educational therapy, and/or transportation?"[82]

11   24.   Between November 27 and December 1, 2006, and again on January 16, 18, and 19, 2007,

12   ALJ Shrenger conducted a due process hearing.[83]

13   **H.   ALJ Shrenger's March 26, 2007 Decision**

14   25.   ALJ Shrenger issued her decision on March 26, 2007.  She found for the District on all

15   issues, and made the following rulings:

16   **"Did the District deny Student a FAPE by refusing to administer his G-tube**

17   **feeding during school hours using the plunge method?**

18   *- Based on Factual Findings 22-36 and Legal Conclusions 3-5 and 8, for the 2005*

19   *ESY and the 2005-2006 school year, the District did not deny Student a FAPE by*

20   *refusing to administer his G-tube feeding during school hours using the plunge*

21   *method.  The District was not authorized to use the plunge method because Student*

22   *did not have a prescription for that method of feeding.*

23   *- The evidence did not establish that Student is unable to attend school due to the*

24   *District's refusal to give his feedings at school by the plunge method.  The evidence*

25   _____

26   [81]*Id.* at 4; Complaint, ¶ 14.

27   [82]AR at 88.

28   [83]*Id.* at 296.

*did not establish Student has a medical reason for not attending school. On the contrary, the evidence clearly established that Student is healthy and well-nourished and would benefit from interacting with peers in a classroom environment. The evidence established that the placement offered by the District (i.e., a special day program for children with multiple disabilities at a special education center) can accommodate Student's G-tube feeding needs. As established by Dr. Mercado's testimony, the District is willing and able to work with Mother and Student's physicians to determine the appropriate method for feeding Student at school in accordance with Student's medical needs and the District Guidelines. Mother's refusal to authorize the District to communicate with Student's private physicians, such as Dr. Idries, appears to be a major obstacle to resolving Student's feeding issues at school.*

*- Mother testified that she does not want to put her son's health at risk by trying different methods of feeding (such as the District's proposal to give two feeds of the pureed mixture diluted with water or other liquid). Yet, she is willing to allow school personnel to feed her son using the plunge method, even though the plunge method is considered unsafe by medical professionals, including Student's own gastrointestinal physician, Dr. Idries. It was not established by the evidence that Student's health would be placed at heightened risk by trying different methods of feeding to determine the optimal feeding method at school. Any such risk is reduced or eliminated by allowing collaboration between the District's physician and Student's private physicians.*

*- The evidence did not establish that Student's nonattendance in school was due to the District's refusal to administer his G-tube feedings by the plunge method. Mother initially withdrew Student from school in May 2005 because of a transportation issue. She did not enroll her son in the ESY 2005 program at Sellery. Nor did she enroll Student in school at the start of the 2005-2006 school year, despite the District's offer to change the offered placement from Sellery to*

13

*Willenburg in an effort to address Mother's concerns about transportation. Mother did not raise the plunge method as a basis for disagreement with Sutdent's IEPs until the April 28, 2006 IEP. Prior to that IEP, the only issue raised by Mother about G-tube feeding was her request to feed Student pureed food that she would provide. If the plunge method was the reason Student was not in school, then the feeding prescription Mother obtained in January 2006 should have indicated the plunge method as Student's prescribed method of feeding, which it does not. Instead, the prescription only mentions the feeding of pureed food that Mother provides, as she requested at the March 8, 2005 IEP.*

**Did the District deny Student a FAPE by failing to offer placement in a nonpublic school that allows G-tube feeding by the plunge method or, alternatively, a home school program?**

*- Based on Factual Findings 39-44 and Legal Conclusion 7, the District did not deny Student a FAPE by not offering a placement in a nonpublic school or a home school program. Student was not entitled to a nonpublic school placement because the District could accommodate his unique feeding needs. A home school program was not appropriate for Student because home schooling is a temporary placement for children who are too ill or injured to attend school. The District's offer of placement in a special day program for children with multiple disabilities was appropriate to meet Student's unique feeding needs.*

**Is Student entitled to compensatory education?**

*- As Student was not denied a FAPE for the time periods at issue, Student is not entitled to compensatory education.* "[84]

26.   Based on her findings and conclusions, ALJ Shrenger denied C.N.'s request for relief.[85]

---

[84]*Id.* at 309-10.

[85]*Id.* at 310.

1

### I.    The Present Action

2  27.  On June 8, 2007, plaintiff filed this appeal of the ALJ's decision.[86]  C.N. contends that

3  ALJ Shrenger erred: (1) in admitting evidence regarding the G-tube policies of the

4  California Department of Education because it was improperly authenticated and

5  inadmissible hearsay; (2) in refusing to allow plaintiff to present evidence to rebut the

6  claims introduced regarding the G-tube policies of the California Department of Education,

7  as allowed by California Code of Civil Procedure § 1916; (3) by giving undue weight to

8  fraudulent evidence proffered by the District regarding the G-tube policies of the California

9  Department of Education; (4) by mischaracterizing the testimony of plaintiff's witness, Dr.

10  Idries, regarding the use of the plunge method; (5) by giving undue weight to the testimony

11  of the District's witness, Dr. Rosa Mercado, regarding the use of the plunge method; (6)

12  in concluding that the District did not deny a FAPE by refusing to administer C.N.'s G-

13  tube feeding using the plunge method given the substantial evidence offered regarding its

14  appropriateness for the unique medical needs of plaintiff; (7) in concluding that the District

15  did not deny FAPE by failing to offer placement in a nonpublic school that allowed G-tube

16  feeding by the plunge method, or alternatively, a home school program; (8) in concluding

17  that plaintiff was not entitled to compensatory education.[87]

18

19

### II.  CONCLUSIONS OF LAW

20  **A.    Standard of Review**

21  1.  This action is brought pursuant to 20 U.S.C. § 1415(i)(2)(A), which provides that a party

22  aggrieved by the findings and decision of a due process hearing conducted by a State

23  educational agency has a right to bring a civil action in either state or district court.

24  Section 1415(i)(2)(B) provides:

25  "In any action brought under this paragraph, the court –

26  _____

27  [86]Complaint, ¶ 18.

28  [87]*Id.*

(i)     shall receive the records of the administrative proceedings;

(ii)    shall hear additional evidence at the request of a party; and

(iii)   basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B).

2.   The court reviews the decision of the hearing officer de novo, according due weight to the hearing officer's judgments regarding education policy. *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1471-72 (9th Cir. 1993); see also *Bd. of Educ. of Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982) ("[T]he provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review"); *Adams v. State of Oregon*, 195 F.3d 1141, 1145 (9th Cir. 1999) (recognizing that a court should give "due weight to the hearing officer's administrative proceedings"); *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 892 (9th Cir. 1995) ("The district court's independent judgment is not controlled by the hearing officer's recommendations, but neither may it be made without due deference" to them because this is what Congress intended in enacting 20 U.S.C. § 1415"); *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1311 (9th Cir. 1987) ("How much deference to give state educational agencies . . . is a matter for the discretion of the courts"). A court must be particularly deferential to a hearing officer's findings where they are "thorough and careful," *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir. 1994), or where they "are based on credibility determinations of live witness testimony." *J.S. v. Shoreline Sch. Dist.*, 220 F.Supp.2d 1175, 1184 (W.D. Wash. 2002) (citing *Amanda J. ex rel. Annette J. v. Clark County Sch. Dist.*, 267 F.3d 877, 887-89 (9th Cir. 2001)).

3.   At the administrative hearing, a school district has the burden of proving that it complied with the IDEA. On review in district court, however, the burden of proof is on the party challenging the administrative ruling. *Ms. S. ex rel. G. v. Vashon Island Sch. Dist.*, 337 F.3d 1115, 1127 (9th Cir. 2003) (citing *Clyde K. v. Puyallup Sch. Dist., No. 3*, 35 F.3d 1396, 1401 (9th Cir. 1994)).

16

**B.     Whether the District Committed Substantive Violations That Denied C.N. a FAPE**

4.     Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education [or 'FAPE'] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education . . . ."[88]  20 U.S.C. § 1400(d)(1)(A).  The special educational services guaranteed to a disabled student by the IDEA must be tailored to the student's own unique needs by means of an IEP.[89]  *Rowley*, 458 U.S. at 181; see *Sch. Committee of Town of Burlington, Mass.*

---

[88]IDEA defines "free appropriate public education" for children with disabilities as "special education and related services that (A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program. . . ." 20 U.S.C. § 1401(9).

It defines "special education" as "specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability, including (A) instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings; and (B) instruction in physical education." 20 U.S.C. § 1401(29). "Related services" include

"transportation, and such developmental, corrective, and other supportive services (including speech-language pathology and audiology services, interpreting services, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, school nurse services designed to enable a child with a disability to receive a free appropriate public education as described in the individualized education program of the child, counseling services, including rehabilitation counseling, orientation and mobility services, and medical services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children." 20 U.S.C. § 1401(26).

[89]An IEP is "a written statement for each child with a disability that is developed, reviewed, and revised . . . and that includes. . .

(I) a statement of the child's present levels of academic achievement and functional performance . . .

(II) a statement of measurable annual goals, including academic and functional goals . . .

(III) a description of how the child's progress toward meeting the annual goals . . .

17

*v. Dep't of Educ. of Mass.*, 471 U.S. 359, 368 (1985) ("The *modus operandi* of the Act is the . . . [IEP –] a comprehensive statement of the educational needs of a handicapped child and the specially designed instruction and related services to be employed to meet those needs"); accord *Ojai*, 4 F.3d at 1469; see also *County of San Diego v. Cal. Special Educ. Hearing Office*, 93 F.3d 1458, 1461 (9th Cir. 1996) ("Crafted annually by the child's teacher, her parents, a representative of the school district, and, where appropriate, the child, the IEP ensures that the child's education is tailored to her individual needs").

5.    A student is denied a FAPE if the IEP is not reasonably calculated to confer educational benefit. *Rowley*, 458 U.S. at 207; *W.G. v. Bd. of Trustees of Target Range Sch. Dist. No. 23, Missoula, Mont.*, 960 F.2d 1479, 1484 (9th Cir. 1992).  A school district satisfies its obligation of providing a FAPE "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction.  Such instruction and services must be provided at public expense, must meet the State's educational standards, must approximate the grade levels used in the State's regular education, and must comport with the child's IEP." *Rowley*, 458 U.S. at 203-04.

6.    In addition to requiring that school districts provide eligible students with a FAPE, the IDEA establishes certain procedural requirements for determining what constitutes a FAPE in an individual case.  "Congress placed every bit as much emphasis upon compliance with

---

will be measured and when periodic reports on the progress the child is making toward meeting the annual goals . . . will be provided . . .
(IV) a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child, and a statement of the program modifications or supports for school personnel that will be provided for the child. . .
(V) an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class and in the activities . . .
(VII) the projected date for the beginning of the services and modifications described in subclause (IV), and the anticipated frequency, location, and duration of those services and modifications. . . ." 29 U.S.C. § 1414(d)(1)(A)(i).

procedures giving parents and guardians a large measure of participation at every stage of the administrative process as it did upon the measurement of the resulting IEP against a substantive standard." *Rowley*, 458 U.S. at 205-06 (citing 20 U.S.C §§ 1415(a)-(d)). Thus, procedurally the IDEA ensures "[a]n opportunity for the parents of a child with a disability to examine all records relating to such child and to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a free appropriate public education to such child, and to obtain an independent educational evaluation of the child." 20 U.S.C. § 1415(b)(1). It accomplishes these objectives by giving parents a right to request an evaluation to determine a child's eligibility for special educational services, 20 U.S.C. § 1414(a)(1)(A), (2)(B), to participate in setting the child's goals and determining the appropriate services to be provided as part of the IEP together with local educational agency representatives, 20 U.S.C. § 1414(d)(1)(B)(i), and to approve the child's placement in an educational program. 20 U.S.C. § 1414(e).

7.      "Procedural compliance is essential to ensuring that every eligible child receives a FAPE, and those procedures which provide for meaningful parent participation are particularly important." *Amanda J.*, 267 F.3d at 891. Therefore, "[w]hen a district fails to meet the procedural requirements of the Act by failing to develop an IEP in the manner specified, the purposes of the Act are not served, and the district may have failed to provide a FAPE." *Target Range*, 960 F.2d at 1485.[90]

8.      Given the substantive and procedural requirements of the IDEA, a court's inquiry when

---

[90]"Not every procedural violation . . . is sufficient to support a finding that the child in question was denied a FAPE. Technical deviations, for example, will not render an IEP invalid." *Amanda J.*, 267 F.3d at 892 (citing *Burilovich v. Bd. of Educ.*, 208 F.3d 560, 566 (6th Cir.), cert. denied, 531 U.S. 957 (2000)). Procedural inadequacies will result in denial of a FAPE if they (1) "result in the loss of educational opportunity" (*Target Range*, 960 F.2d at 1484); (2) undermine the parents' opportunity to participate meaningfully in formulating the child's IEP (*Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 994 (1st Cir. 1990); *Target Range*, 960 F.2d at 1483); or (3) "cause[ ] a deprivation of educational benefits" (*Roland M.*, 910 F.2d at 994).

parents challenge the adequacy of a child's educational program under the statute is twofold: "First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?" *Rowley*, 458 U.S. at 206-07.

9.    C.N. advances only substantive arguments in support of his contention that the District denied him a FAPE that adequately addressed his feeding and placement needs. C.N. asserts that the District denied him a FAPE by refusing to administer his G-tube feeding using the plunge method "given the substantial evidence regarding its appropriateness for [his] unique medical needs."[91]  He also asserts that the District denied him a FAPE by failing to offer placement in a nonpublic school that allowed G-tube feeding by the plunge method, or alternatively, a home school program.[92]  The court analyzes each issue in turn.

### 1.    Whether the District Denied C.N. a FAPE By Refusing to Administer His G-Tube Feedings Via the Plunge Method

10.   "[I]f personalized instruction is being provided with sufficient supportive services to permit the child to benefit from the instruction, and the other items on the definitional checklist are satisfied, the child is receiving a 'free appropriate public education' as defined" by the IDEA. *Rowley*, 458 U.S. at 189.  The term "related services," referred to as designated instruction and services ("DIS") in California, includes transportation "and such developmental, corrective, and other supportive services . . . as may be required to assist a child with a disability to benefit from special education." 20 U.S.C. § 1401(26); see CAL. EDUC. CODE § 56363(a).  A medical service that must be made available for a child to remain at school during the day is a service a school district must provide so the student can benefit from special education.  See *Irving Independent School Dist. v. Tatro*, 468 U.S. 883, 890-91 (1984) (requiring a school given a student with spina bifida clean intermittent

---

[91]Complaint, ¶ 18.

[92]*Id.*

catheterization so that she could attend special education classes). Medical services, however, must generally be supportive in nature. See CAL. EDUC. CODE § 56363(b)(12) (indicating that DIS may include "[h]ealth and nursing services, including school nurse services *designed to enable* an individual with exceptional needs to receive a free appropriate public education as described in the individualized education program").

11. Under California law, health and nursing services required for a student to benefit from his or her education may include "[p]roviding services by qualified personnel" and "[m]anaging the individual's health problems on the school site." 5 CAL. CODE REGS. 3051.12(a). "'Specialized physical health care services' [("SPHCS")] means those health services prescribed by the individual's licensed physician and surgeon requiring medically related training for the individual who performs the services and which are necessary during the school day to enable the individual to attend school." 5 CAL. CODE REGS. 3001(ad); 5 CAL. CODE REGS. 3051.12(b)(1)(A). School personnel and health care professionals are required to collaborate in determining the SPHCS a student needs. 5 CAL. CODE REGS. 3051.12(b)(1)(B) ("Standardized procedures means protocols and procedures developed through collaboration among school or hospital administrators and health professionals, including licensed physicians and surgeons and nurses, to be utilized in the provision of the specialized physical health care services").

12. G-tube feeding is a SPHCS under California law. CAL. EDUC. CODE § 49423.5(d) ("'Specialized physical health care services,' as used in this section, include catheterization, gastric tube feeding, suctioning, or other services that require medically related training"). Administering G-tube feeding via the gravity method was the District's standard medical practice, and was supported by the protocols and guidelines of the CDE.[93]

13. Although the District refused to administer C.N.'s G-tube feedings via the plunge method, the ALJ's conclusion that this did not deny C.N. a FAPE was supported by substantial

---

[93]AR at 480, 84344, 847, 2052-55.

evidence.  Most importantly, the evidence presented at the administrative hearing showed that feeding via the gravity method was adequately meeting C.N.'s needs and providing him with a FAPE.  Specifically, C.N.'s healthcare assistant at Sellery, Magda James, testified that during the year and a half to two year period she worked with C.N., she gave him Gatorade and juices via the gravity method.[94]  Although C.N.'s mother instructed James how to feed C.N. via the plunge method when she first began working with him, James never attempted it.[95]  Health assessments at the January 2005 and March 2005 IEP team meetings indicated that C.N. was within normal limits for height and weight.[96]  The health assessments stated that C.N. would continue to require a healthcare assistant to monitor his tracheostomy and G-tube feedings, but did not suggest that C.N. was experiencing health problems or other difficulties.[97]

14.   It is also significant that C.N.'s mother proffered no evidence to the IEP team that C.N. required plunge feeding.  Following her request that the District feed C.N. pureed foods provided by her at the March 2005 and February 2006 team meetings, the District asked C.N.'s mother to obtain a doctor's protocol for this type of procedure; C.N.'s mother "agreed to provide the necessary paperwork."[98]  She did not, however, nor did she assert that it was medically necessary to use the plunge method to feed C.N.[99]  At the April 2006 IEP team meeting, C.N.'s mother stated that C.N. was not in school "due to the fact that the doctor ha[d] provided a prescription (using pureed foods pushed) and LAUSD will not

---

[94]*Id.* at 983-84.

[95]*Id.* at 991.

[96]*Id.* at 1933, 1957.

[97]*Id.*

[98]*Id.* at 1978, 2007.

[99]*Id.* at 1554.

administer G-Tube feeding as prescribed."[100]   Although C.N.'s mother presented a January 25, 2006 prescription at the hearing before the ALJ, she did not provide this written prescription at the IEP team meeting.[101]   More fundamentally, the prescription presented does not order the plunge method.[102]   C.N.'s expert witness, Dr. Idries, testified that she interpreted the prescription as direct that C.N. be fed by hanging a syringe for delivery via the gravity method.[103]   C.N. has thus failed to establish that he required feeding by the plunge method in order to attend school, and the ALJ properly concluded that the District did not deny him a FAPE during the 2005 ESY and the 2005-2006 school year by declining to provide such a service.

> **2.   Whether the District Denied C.N. a FAPE By Refusing to Offer Placement in a Nonpublic School or in a Home School Program**
>
> **a.   Nonpublic School**

15.   Under California law, placement in a nonpublic school is appropriate only "if no appropriate public school education program is available."   See CAL. EDUC. CODE § 56365(a) ("Services provided by nonpublic, nonsectarian schools, as defined pursuant to Section 56034, and nonpublic, nonsectarian agencies, as defined pursuant to Section 56035, shall be made available.   These services shall be provided pursuant to Section 56366, and in accordance with Section 300.146 of Title 34 of the Code of Federal Regulations, under contract with the local educational agency to provide the appropriate special educational facilities, special education, or designated instruction and services required by the individual with exceptional needs if no appropriate public education program is available"); see also *Newport-Mesa Unified School Dist. v. Hubert*, 132

---

[100]*Id.* at 2050.

[101]*Id.* at 619, 1305, 1566-67, 2050.

[102]*Id.* at 1851.

[103]*Id.* at 934-37.

Cal.App.3d 724, 728 (1982) ("[A] school district is not required to pay for a student's private school education if he or she is placed there by his or her parents and there is an available free appropriate public education," citing 34 C.F.R. § 300.403(a) and CAL. EDUC. CODE § 56365(a)).

16.   As discussed earlier, the evidence presented at the hearing demonstrated that the District was not required to use the plunge method to feed C.N. in order to provide him with a FAPE. Because a FAPE was available to C.N. in a District school – i.e., by administering his G-tube feedings via the gravity method – the ALJ's conclusion that he was not entitled to placement in a nonpublic school was correct. C.N., moreover, failed to demonstrate that a nonpublic school would be willing and able to feed him via the plunge method. Maria Davis, the owner of Carousel School, and Renee Kelly Williams, the owner of Tijay Renee Academy School, were called to testify regarding their respective nonpublic school programs. Davis testified that her school would not utilize the plunge method if the District did not authorize that method in the IEP or if it violated District and/or CDE guidelines.[104] Williams, for her part, stated that she could hire a registered nurse to feed C.N. via the plunge method; she acknowledged, however, that when a student is referred by the District, the nonpublic school must comply with that student's IEP.[105] As can be seen, these witnesses did not conclusively establish that C.N. could be fed via the plunge method in a nonpublic school setting.

### b.   Home Placement

17.   The California Education Code provides that school districts may establish home teaching programs. See CAL. EDUC. CODE § 51800 et seq. Jann Merithew, a District home-hospital administrator, testified that under the District's home-hospital program, students qualify for home instruction based primarily on physician recommendation that they are

---

[104]*Id.* at 1437-38.

[105]*Id.* at 1657-58, 1660-62.

too ill or injured to attend school.[106]   Home schooling is intended only as a temporary placement.[107]   While the placement is typically based on a physician's recommendation, the District may overrule the recommendation if it can provide all of the student's needed medical services.[108]

18.   As with his claim for placement in a nonpublic school, C.N. has failed to establish that he was entitled to a home placement.   The evidence demonstrated that at the time of his withdrawal from school, C.N.'s height and weight were within normal limits.[109]   The District's physician, Dr. Mercado, stated that there were no medical contraindications to C.N. returning to school.[110]   Both Dr. Mercado and C.N.'s own physician, Dr. Idries, testified that C.N. would benefit from being in school.[111]   C.N.'s mother also testified that she would prefer to have C.N. return to a classroom setting.[112]   Therefore, a home placement was not an appropriate option for C.N., and the ALJ properly concluded that the District was not required to offer such a placement to provide C.N. with a FAPE.

19.   Because the court finds that the ALJ properly concluded the District did not deny C.N. a FAPE, the ALJ's conclusion that C.N. was not entitled to compensatory education is also correct.[113]   Under the IDEA, a court may "grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C)(iii).  A school district may be ordered to provide compensatory education to a student if the student has been denied a FAPE.  See *Parents*

---

[106]*Id.* at 1406, 1409.

[107]*Id.*

[108]*Id.* at 1410.

[109]*Id.* at 1933, 1957.

[110]*Id.* at 2058.

[111]*Id.* at 514, 933, 1852.

[112]*Id.* at 1067-68.

[113]See *id.* at 307.

*of Student W. v. Puyallup School Dist., No. 3*, 31 F.3d 1489, 1496-97 (9th Cir. 1994). Because the evidentiary record demonstrates that C.N. was not denied a FAPE, he has failed to demonstrate that he is entitled to compensatory education.

**C.     Whether the ALJ Properly Admitted and Considered the CDE Guidelines Regarding G-Tube Feeding**

20.    In his complaint, C.N. alleges that the CDE guidelines on G-tube feeding were improperly admitted and considered by ALJ Shrenger.[114]  ALJ Shrenger observed that the District's guidelines were consistent with the CDE guidelines, which only provide for G-tube feedings via the gravity method.[115]

21.    Rule 901 of the Federal Rules of Evidence provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." FED. R. EVID. 901(a).  Rule 901(b)(1) permits authentication by the testimony of a witness with knowledge "that a matter is what it is claimed to be." FED. R. EVID. 901(b)(1).  Stated differently, "'[a] document can be authenticated [under Rule 901(b)(1)] by a witness who wrote it, signed it, used it, or saw others do so.'" *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 774 n. 8 (9th Cir. 2002) (quoting 31 Wright & Gold, FEDERAL PRACTICE & PROCEDURE: EVIDENCE § 7106, 43 (2000)).

22.    At the administrative hearing, C.N. called Dr. Mercado, who worked for the District for 17 years as a school physician and/or director of Student Medical Services.[116]  Dr. Mercado testified that she was familiar with the CDE guidelines concerning G-tube feeding, had reviewed them in the scope of her employment, understood that they were produced by CDE, and that they represented the "best medical practice that is safe to the

---

[114]Complaint, ¶ 18.

[115]AR at 301-02.

[116]*Id.* at 417-20.

individual" that can be used in a school setting.[117]   Because Dr. Mercado stated that she used the guidelines in the course of her professional work with the District, the guildelines were properly authenticated and the ALJ appropriately admitted those parts that related to G-tube feedings.

23.   Additionally, it was appropriate for the ALJ to take judicial notice of the CDE guidelines under Rule 201.   See FED. R. EVID. 201(b) ("A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned").   "Courts may take judicial notice of some public records, including the 'records and reports of administrative bodies.'"   *United States v. Ritchie*, 342 F.3d 903, 909 (9th Cir. 2003) (quoting *Interstate Nat. Gas Co. v. S. Cal. Gas Co.*, 209 F.2d 380, 385 (9th Cir. 1953)); see also *Disabled Rights Action Committee v. Las Vegas Events, Inc.*, 375 F.3d 861, 866 n. 1 (9th Cir. 2004) ("Under Federal Rule of Evidence 201, we may take judicial notice of the records of state agencies and other undisputed matters of public record," citing *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (explaining that a court may judicially notice matters of public record unless the matter is a fact subject to reasonable dispute); *Kottle v. N.W. Kidney Ctrs.*, 146 F.3d 1056, 1064 n. 7 (9th Cir. 1998) (holding that state health department records were properly judicially noticed); *Mack v. S. Bay Beer Distribs., Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986) (stating that a court may take judicial notice of records and reports of state administrative bodies), overruled on other grounds by *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104 (1991)).   The CDE guidelines contain a copyright page which states that they were published by the California Department of Education, printed by the Office of State Printing, and distributed under the provisions of the Library Distribution Act and California Government Code § 11096.[118]   While C.N.

---

[117]*Id.* at 490-95, 499-501.

[118]*Id.* at 2064.

27

may dispute the import of the guidelines, he offers no persuasive argument that the document admitted by the ALJ did not contain the guidelines issued by the CDE.

24.  C.N. also argues that ALJ Shrenger erred by denying him the opportunity to rebut the evidence the District offered regarding the CDE's G-tube feeding guidelines.[119]  The District disclosed its intent to use the guidelines as an exhibit in its Notice of Documentary Evidence, which it served on November 20, 2006.[120]  It also provided a copy of the exhibit prior to the hearing in accordance with the IDEA.  See 20 U.S.C. § 1415(f)(2)(A) ("Not less than 5 business days prior to a hearing conducted pursuant to paragraph (1), each party shall disclose to all other parties all evaluations completed by that date, and recommendations based on the offering party's evaluations, that the party intends to use at the hearing").  The CDE guidelines were then introduced into evidence on November 28, 2006, the first day of the administrative hearing.[121]  C.N.'s counsel objected to admission of the document on the basis of improper authentication.[122]  In response, Dr. Mercado provided additional foundational information and the ALJ admitted pages 67 through 70 of the document – i.e., the pages pertaining to G-tube feeding guidelines.[123]

25.  As discussed above, the ALJ's admission of the CDE guidelines on G-tube feeding was proper, given the fact that Dr. Mercado used the guidelines in the course of her work. C.N. had the opportunity to introduce rebuttal evidence during seven subsequent hearing

---

[119]Complaint, ¶ 18.  C.N. argues that he should have been permitted to rebut the District's evidence under California Code of Civil Procedure § 1916.  (*Id*.).  Section 1916 states that "[a]ny judicial record may be impeached by evidence of a want of jurisdiction in the Court or judicial officer, of collusion between the parties, or of fraud in the party offering the record, in respect to the proceedings."  CAL. CODE CIV. PROC. § 1916.  The CDE guidelines, however, are not judicial records, and therefore § 1916 does not apply.

[120]AR at 92, 97.

[121]*Id*. at 502.

[122]*Id*. at 499.

[123]*Id*. at 499-502.

days, but failed to do so.  Instead, as part of his closing brief, C.N. attempted to introduce an email from a "CDE consultant," who stated that to the best of her knowledge, the CDE has never had a "G-tube policy."[124]  C.N. did not present the email as evidence during the administrative hearing, the author of the email did not testify at the hearing, and the email was not properly sworn or authenticated by a declaration.  The ALJ determined that C.N.'s argument was, in effect, an untimely motion to strike the District's evidence and denied it.[125]

26. Given that the District introduced the CDE guidelines into evidence on November 28, 2006, that C.N. failed to present any evidence rebutting their content during the subsequent administrative hearings, and that the email did not constitute sworn testimony, the court concludes that ALJ Shrenger did not err in refusing to consider the CDE consultant's email that C.N. belatedly proffered.

**D.     Whether the ALJ Properly Weighed the Testimony of Witnesses**

27. "'Normally, a finder of fact's determination of credibility receives deference on appeal, because access to live testimony is important to the credibility finding.'"  *K.S. ex rel. P.S. v. Fremont Unified School Dist.*, 545 F.Supp.2d 995, 1003 (N.D. Cal. 2008) (quoting *Ms. S. ex rel. G. v. Vashon Island Sch. Dist.* 337 F.3d 1115, 1127 (9th Cir. 2003), and citing *Amanda J. ex rel. Annette J. v. Clark County Sch. Dist.*, 267 F.3d 877, 889 (9th Cir. 2001) (holding, in the IDEA context, that an administrative hearing officer "who receives live testimony is in the best position to determine issues of credibility").  "A district court should accept the ALJ's credibility determinations 'unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion.'"  *Id.* (quoting *Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004), and citing *Arulampalam v. Ashcroft*, 353 F.3d 679, 685 (9th Cir. 2003) ("While we accord substantial deference to an IJ's credibility finding[,]. . . [w]hen the IJ provides specific

---

[124]*Id.* at 154.

[125]*Id.* at 302.

reasons for the questioning of a witness's credibility, this court may evaluate those reasons to determine whether they are valid grounds upon which to base a finding that the applicant is not credible"); *Gao v. Bd. of Immigration Appeals*, 482 F.3d 122, 127 (2d Cir. 2007) ("credibility determinations that are based on the IJ's analysis of testimony, as opposed to demeanor, are granted less deference")). "Nonetheless, a district court is not required to accept any findings by the ALJ which are arbitrary and capricious or an abuse of [her] discretion." *Id.* (citing *Aguilera-Cota v. INS*, 914 F.2d 1375, 1381 (9th Cir. 1990) ("[T]here must be a rational and supportable connection between the reasons cited and the conclusion that the petitioner is not credible")).

28.    C.N. contends that ALJ Shrenger mischaracterized the testimony of his witness, Dr. Idries, regarding the plunge method.[126] The ALJ did not determine that Dr. Idries lacked credibility, however.  Rather, she concluded that Dr. Idries' recommendation that C.N. be fed via the plunge method was not persuasive in light of all of the evidence.[127]  As noted, Dr. Idries testified that the plunge method was unsafe, and that if it had to be utilized by the District, C.N.'s mother would need to be involved in training District employees.[128]  Dr. Idries' opinion that the plunge method was viable for C.N. was based not on her own observations, but solely on the reports of C.N.'s mother that this method worked best for her son.[129]  Dr. Idries acknowledged that she did not examine the District's protocols, nor consult with District personnel prior to offering this opinion.[130] Additionally, she  testified that she discouraged C.N.'s mother from demanding that the plunge method be used at school, and that she would have explored other feeding options had she been

---

[126]Complaint, ¶ 18.

[127]AR at 304.

[128]*Id.* at 410-11, 1852.

[129]*Id.* at 926-29.

[130]*Id.* at 927.

asked.[131]  In her decision, ALJ Shrenger correctly summarized Dr. Idries' testimony regarding these issues.[132]  In light of this evidence, the court concludes that the ALJ gave the proper weight to Dr. Idries' testimony.

29. C.N. next argues that the ALJ gave undue weight to the testimony of the District's witness, Dr. Mercado.[133]  After being asked to develop a feeding recommendation for C.N., Dr. Mercado visited C.N. at home to observe his mother administer the plunge method; she completed a medical history review, and consulted with the gastrostomy feeding clinic at Children's Hospital.[134]  The staff at Children's Hospital informed Dr. Mercado that the plunge method was never an appropriate feeding method due to the risks of reflux and regurgitation.[135]  Although Dr. Mercado observed that C.N. experienced no distress when his mother fed him via the plunge method and that C.N.'s mother utilized the method well, she noted that this success was likely due to the fact that C.N.'s mother knew her son intimately – e.g., she knew exactly how much pressure to apply and when C.N. was uncomfortable.[136]  Dr. Mercado opined that the plunge method was unsafe in a school setting because there was no guarantee that the same person would continuously administer the student's feeding.[137]  Based on her investigation, she concluded that C.N. could safely be fed a diluted solution of his pureed food via the gravity method while at school.[138]  Because both Dr. Idries and Dr. Mercado testified that the plunge method was unsafe, and

---

[131]*Id.* at 929-31, 941, 1852.

[132]*Id.* at 304.

[133]Complaint, ¶ 18.

[134]AR at 426, 433, 508, 2058.

[135]*Id.* at 510.

[136]*Id.* at 516, 2058.

[137]*Id.* at 516-17.

[138]*Id.* at 2058.

because of the difficulties both doctors identified in training a District employee to use the method, the ALJ appropriately found persuasive Dr. Mercado's recommendation that C.N. be fed diluted foods via the gravity method while at school.   As a result, the court concludes that ALJ Shrenger did not err in weighing the respective testimonies of Dr. Idries and Dr. Mercado.

### III.   CONCLUSION

For the reasons stated, the court denies plaintiff's appeal.


DATED: October 9, 2008

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE